## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| TRACY BLAIS, Mother and Next Friend of SAMANTHA BLAIS, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 08-40221-FDS |
| v. | ) ) | |
| THE HARTFORD FIRE INSURANCE COMPANY, | ) ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, DEFENDANT'S MOTIONS TO STRIKE, AND PLAINTIFF'S MOTION FOR ATTORNEY'S FEES

**SAYLOR, J.**

This is a dispute involving insurance coverage. On January 9, 2006, plaintiff Tracy Blais and her daughter, Samantha Blais, were involved in an automobile accident that resulted in severe injury to Samantha. They were passengers in a rental car being driven by Tracy's husband and Samantha's father, Craig Blais. Plaintiff now seeks to recover on two insurance policies issued to Craig's employer by defendant The Hartford Fire Insurance Company. Defendant contends that Craig is not an "insured" under the policies.

Plaintiff filed this action seeking a declaratory judgment that coverage exists, as well as costs and attorney's fees. Plaintiff also seeks multiple damages pursuant to Mass Gen. Laws ch. 93A. Jurisdiction is based on diversity of citizenship. Defendant has moved for summary judgment, and has filed two motions to strike; plaintiff has opposed those motions and has moved for an award of attorney's fees. For the reasons set forth below, defendant's motion for summary

judgment will be granted in part and denied in part. Defendant's motion to strike supplemental answers to interrogatories will be denied as moot, and its motion to strike parts of Craig's affidavit will be granted in part and denied in part. Plaintiff's motion for attorney's fees will be granted.

## I.     Factual Background

The facts are presented in the light most favorable to plaintiff, the non-moving party.

### A.     The Parties

Plaintiff Tracy Blais is the mother of Samantha Blais, a minor. Tracy is the wife of Craig Blais, who works at the Worcester Business Development Corporation ("WBDC"). WBDC is a non-profit organization dedicated to economic development in Worcester, Massachusetts and the surrounding communities. Its principal place of business is in Worcester. (Def. Facts ¶ 1).[1]

Defendant The Hartford Fire Insurance Company is an insurer with its principal place of business in Hartford, Connecticut. It is licensed to issue property and casualty insurance in Massachusetts.

### B.     Craig Blais's Employment with WBDC

Craig was hired by WBDC on April 1, 1999, as executive vice president. (*Id.* ¶ 17). In that capacity, Craig was responsible for overseeing WBDC's employees and daily operations, managing projects, and supervising the company's small business administration program. (*Id.* ¶ 19). He receives a W-2 employee form from WBDC for tax reporting purposes. (Pl. Resp. ¶ 18).

When Craig was hired by WBDC, he negotiated a salary and benefits package. (Def. Facts ¶¶ 20-21, Ex. M). Included among his benefits was an allowance for a leased vehicle at a

---

[1] WBDC also wholly owns a subsidiary named WBDC, LLC.

cost of up to $400 per month. (*Id.* ¶ 22).[2] WBDC paid the lessor directly for the vehicles, but Craig leased the vehicles in his own name. (*Id.* ¶¶ 22, 25; Pl. Facts Ex. B). WBDC also paid for vehicle-related expenses, including insurance; the corporation did not place limits on the amount of automobile insurance coverage that Craig could purchase. (Def. Facts ¶¶ 27, 28). Craig and WBDC understood that Craig would use the leased automobiles for both business and personal purposes. (*Id.* ¶ 26).

### C.     The Car Accident and the Injuries to Samantha Blais

The Blais family took a vacation to Orlando, Florida, in January 2006. Tracy rented a car to use for the family's vacation. (*See* Def. Facts Ex. W). On January 9, Craig, Tracy, Samantha, and their other child drove from the Palms Hotel to the Marriott World Conference Center. Craig was driving. His plan was to drop his wife off at a professional conference and then go do something else with the children. (*See* Pl. Facts Ex. 1 at 45).

While en route, the family was involved in a serious car accident. As a result of the accident, Samantha, who was four years old at the time, lost sight in one eye and sustained traumatic brain injury. (*See id.* Ex. T). Her medical expenses currently exceed $110,000, and she will require ongoing care for the rest of her life. (Am. Compl. ¶ 20). Craig admitted his fault for the crash and received a citation for failing to stay within marked lanes.

### D.     Craig Blais's Personal Automobile Insurance Policy

At the time of the accident, Craig was covered by a personal automobile insurance policy issued by the Encompass Insurance Company of Massachusetts. (Def. Facts ¶ 34). The

---

[2] After the initial three-year lease term for the vehicle elapsed, WBDC authorized Craig to spend up to $500 per month on a leased vehicle. (Pl. Facts Ex. 7 at 64). WBDC also provided him with a cell phone and paid for all related cell-phone expenses. (*Id.* ¶ 33).

premiums for the policy were paid by WBDC. (*Id.* ¶ 27).[3] The policy was issued to Craig and named Tracy as an additional insured. (Def. Facts Ex. N). It provided bodily injury coverage of up to $100,000 per person and $300,000 per accident. (*Id.* ¶ 34, Ex. N). It covered use of any automobile for business or personal reasons. (Pl. Facts ¶ 34).

Following the January 9, 2006 accident, a claim was filed against Encompass on behalf of Samantha. Encompass thereafter entered into a settlement agreement for payment of proceeds under the policy. (*Id.* Ex. 1 at 62).

### E. WBDC's Insurance Policies

At the time of the accident, WBDC was covered by two relevant policies issued by The Hartford. The first was a $1 million general liability policy, modified to include accident coverage for hired and non-owned automobiles. (Def. Facts Ex. B at 21). As applied to automobiles, this policy was designed to cover only amounts in excess of what was collectible from existing primary automobile insurance. (*Id.* Ex. A at 2). The second was a $5 million "umbrella policy" designed to cover amounts in excess of the limits of the general liability policy. (*Id.* Ex. B at 144, 155).[4]

WBDC obtained these policies from The Hartford through an insurance agency called The Protector Group. The Protector Group was authorized to solicit, quote, and bind insurance on

---

[3] Craig purchased this personal automobile insurance policy through the Braley & Wellington Insurance Agency. (Def. Facts ¶ 29). He had purchased home and automobile insurance through that agency since 1990, and Tracy also purchased personal automobile insurance for her car through the same agency. (*Id.* ¶¶ 30-32).

[4] So, for example, if an automobile was involved in a covered accident, the claimant would first look to any other existing insurance for coverage. If the claim was greater than existing insurance could pay, the claimant would then look to the general liability policy to pay the remaining amount up to the general liability coverage limit of $1 million. If the claim was greater than what the primary and general liability policies could pay, the claimant would then look to the umbrella policy to pay the remaining amounts up to the umbrella coverage limit of $5 million.

behalf of The Hartford pursuant to an "Agency Agreement" signed by those parties.  (Pl. Facts. ¶ 106; Pl. Opp'n to Def. 2d Mot. Strike Ex. 2).  Don Willoughby, an account executive at the Protector Group, handled the WBDC account at all relevant times.

Willoughby and WBDC reviewed WBDC's insurance coverage annually, and he would advise the company about what policies it should purchase to protect itself from risks associated with its activities.  Craig was involved in these discussions.  (Pl. Resp. ¶ 43).[5]  Prior to the accident, WBDC purchased insurance from The Hartford to "fill in the gaps" in its existing coverage.  (Pl. Facts Ex. 1 at 35, 40).  As part of this discussion, Willoughby explained to WBDC that the endorsement for hired and non-owned automobiles would cover its officers in addition to whatever coverage was provided by the officers' existing automobile insurance.  (*Id.* Ex. 7 at 70, 93).  In November 2005, Willoughby requested and received a list of all WBDC employees and officers who used their personal vehicles on WBDC business; the list included Craig.  (*Id.* Ex. 7 at 28).

Relying on Willoughby's statements, WBDC purchased general liability and umbrella insurance from The Hartford.  It also executed a "Hired Auto and Non-Owned Auto" endorsement, which modified the terms of the general liability policy to include coverage for certain automobiles.  (Def. Facts Ex. A).

### E.  The Hartford's Handling of the Claim

On April 24, 2006, The Protector Group notified The Hartford of a potential claim under the WBDC policies for Samantha's injuries.  Four days later, The Hartford's claims handler, Patty

---

[5] There is a factual dispute as to whether Craig was involved in insurance discussions with Willoughby on behalf of WBDC.  Willoughby has testified that he was not involved.  (Pl. Facts Ex. 6 at 79). Craig has testified that he was.  (*Id.* Ex. 1 at 32-33, 37, 39).

Gooch, contacted WBDC. She determined that Craig was on vacation at the time of the accident, that the car was not rented with a corporate credit card, and that the car was not rented for the business purposes of WBDC. (*See id.* Ex. O at 24).[6] She did not attempt to contact Craig. (Pl. Facts ¶ 20). Based on this information, Gooch stated in her notes on May 5 that "I see no way insured [WBDC] could be brought into this case." (*Id.*).

Following this, Gooch requested a copy of the WBDC policies and discussed the case with her supervisor, James McClenny. Both Gooch and McClenny concluded that Samantha's injuries were not covered. Gooch thereafter submitted a report to The Hartford's home office. On July 20, Gooch and McClenny participated in another coverage discussion with a Massachusetts attorney from the home office. Without consulting outside counsel, the three agreed that no coverage existed. (Pl. Facts Ex. 2 at 98). Gooch sent a letter to Willoughby on August 1, 2006, disclaiming coverage. Defendant's denial of claim letter described the basis for denial of coverage. (Def. Facts Ex. J).

### F. Procedural History

On October 23, 2006, Tracy sent a demand letter to The Hartford pursuant to Mass. Gen. Laws ch. 93A. In that letter, she set forth her belief that Samantha's injuries were covered by the general liability policy and demanded payment of the $1 million policy limit. (Def. Facts Ex. K). The Hartford responded to this letter on November 20, denying coverage and offering a nominal settlement of $25. (Def. Facts Ex. L).

On December 22, 2008, Tracy filed a personal injury action on behalf of Samantha against

---

[6] No one at The Hartford, however, ever asked WBDC whether Craig had permission to drive a car for personal reasons in Florida. (Pl. Facts ¶¶ 51, 69, 90).

Craig in Worcester Superior Court. (Def. Facts Ex. U). After a second review of the policy by a claims handler, supervisor, and home office consultant, The Hartford declined to defend or indemnify Craig in that action. (Def Facts. Ex. V). The Hartford's claims handler, Frank Morgillo, did not consult any case law before making that determination. (Pl. Facts Ex. 5 at 46). On April 29, 2010, the Superior Court entered a judgment against Craig in the amount of $4 million.

On August 14, 2008, Tracy filed the present action against The Hartford, again in Worcester Superior Court. On November 26, The Hartford removed to this Court on the basis of diversity jurisdiction.

## II.    <u>Standard of Review</u>

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Essentially, Rule 56[] mandates the entry of summary judgment 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Coll v. PB Diagnostic Sys.*, 50 F.3d 1115, 1121 (1st Cir. 1995) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). In making this determination, the Court views "the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor." *Noonan v. Staples, Inc.*, 556 F.3d 20, 25 (1st Cir. 2009).

As a general matter, only evidence that would be admissible at trial may be considered in connection with a motion for summary judgment. *See Garside v. Osco Drug, Inc.*, 895 F.2d 46, 49-51 (1st Cir. 1990). Affidavits, although not themselves admissible at trial, may be offered in

support of, or opposition to, summary judgment if they set forth facts that would be admissible

under the Federal Rules of Evidence. Fed. R. Civ. P. 56(e).

## III. Analysis

### A. Motion to Strike Portions of Craig Blais's Affidavit

Defendant first moves to strike portions of Craig's affidavit. Defendant makes four

arguments: (1) that certain statements are hearsay; (2) that certain statements are unsupported by

the evidence; (3) that certain statements are contradicted by prior testimony; and (4) that certain

statements are irrelevant.

For reasons stated below, the Court rejects the first three arguments and accepts the

fourth as it applies to one of the statements in the deposition. Defendant's motion to strike

portions of Craig's affidavit will therefore be granted in part and denied in part.

#### 1. Alleged Hearsay Statements

In his affidavit, Craig attributes several statements to Don Willoughby, an account

executive at The Protector Group. (*See, e.g.*, Craig Blais Aff. at 2) ("Willoughby told the three of

us at WBDC that the Hartford policies would provide excess coverage in the event of any serious

auto accident."). Defendant contends that these statements are inadmissible hearsay and should

be struck from the record. Plaintiff contends that the statements are admissible for their truth

because Willoughby was defendant's agent.

An affidavit "must . . . set out facts that would be admissible in evidence." Fed. R. Civ. P.

56(c)(4). Hearsay, "a statement, other than the one made by the declarant . . ., offered in

evidence to prove the truth of the matter asserted[,]" is normally inadmissible. Fed. R. Evid.

801(c), 802. Under Rule 801(d)(2)(D), however, "a statement by a party's agent or servant

8

concerning a matter within the scope of the agency or employment, made during the existence of the relationship[,]" is considered a party admission and outside of the hearsay rule. "Parties wishing to introduce statements into evidence under the aegis of Rule 801(d)(2)(D) must establish, by a preponderance of the evidence, (1) that an agency relationship existed; (2) that the statements were made during the course of the relationship; and (3) that the statements relate to matters within the scope of the agency." *Gomez v. Rivera Rodriguez*, 344 F.3d 103, 116 (1st Cir. 2003); *see United States v. Rioux*, 97 F.3d 648, 660 (2d Cir. 1996) (same).

It is undisputed that, at the time of the alleged statements, defendant's relationship with The Protector Group was governed by a signed "Agency Agreement." (*See* Pl. Opp'n to Def. 2d Mot. Strike at 2). Because of a choice-of-law provision in the document, the Court's analysis of the agency agreement is guided by Connecticut law. In Connecticut, "[t]he three elements required to show the existence of an agency relationship are: (1) a manifestation by the principal that the agent will act for him; (2) acceptance by the agent of the undertaking; and (3) an understanding between the parties that the principal will be in control of the undertaking." *Levine v. Advest, Inc.*, 244 Conn. 732, 759 n.16 (1998). The agency agreement clearly satisfies all three elements. The first two elements are satisfied by terms in the assented-to agreement that specifically authorized The Protector Group "to solicit, quote, and bind insurance" on defendant's behalf and "to provide all usual and customary services of an insurance agent on all insurance policies [The Protector Group] place[s] with [defendant]." (Pl. Opp'n to Def. 2d Mot. Strike Ex. 2 at 1, 6). The third element is satisfied by provisions that required The Protector Group to comply with all of defendant's rules, procedures, and policies; to allow defendant to audit the books upon reasonable notice; and to seek authorization from defendant before changing or

waving any policy provision. (*Id.* Ex. 2 at 2, 7).

Having established that an agency relationship existed, the requirement that the alleged statements were made during the course of that relationship is met relatively easily. It is undisputed that the agency agreement was in effect at the time the statements were allegedly made. It is also undisputed that Willoughby was acting as The Protector Group's agent during these discussions. It is therefore clear that Willoughby's comments were made during the course of the agency relationship.

Finally, the Court considers whether the alleged statements were related to matters within the scope of the agency. The objected-to statements all describe either defendant's policies or Willoughby's ability to assess WBDC's insurance needs and recommend specific policies to meet them. There is no evidence that Willoughby was acting in any capacity other than as an agent of defendant. As a result, these statements fall squarely within Willoughby's authority under the agency agreement to solicit, quote, and bind insurance and "to provide all usual and customary services of an insurance agent" with regard to selling and servicing defendant's policies. (*See* Pl. Opp'n to Def. 2d Mot. Strike Ex. 2 at 1). The statements are therefore related to matters within the scope of the agency.[7]

Because Willoughby was acting as defendant's agent when making the alleged statements, they are admissible under Fed. R. Evid. 801(d)(2)(D). *See Canatxx Gas Storage Ltd. v. Silverhawk Capital Partners, LLC*, 2008 WL 1999234, at *12 (S.D. Tex. May 8, 2008)

---

[7] The Court notes that plaintiff is not required to show that defendant authorized Willoughby to make the specific statements that he did. "To qualify as nonhearsay under Rule 801(d)(2)(D), a statement must concern 'a matter within the scope' of the declarant's agency or employment. The statement itself is not required to be 'within the scope of the declarant's agency. Rather, it need only be shown that the statement be related to a matter within the scope of the agency.'" *Larch v. Mansfield Mun. Elec. Dep't*, 272 F.3d 63, 72 (1st Cir. 2001).

(statements by investment broker retained to act as a "sales agent" were party admissions under Rule 801(d)(2)(D)).[8] Craig's attributions to Willoughby will therefore not be struck.

Defendant also requests that the following attribution to Joyce Stewart be struck: "During these meetings, Joyce Stewart explained to Don Willoughby that WBDC provided leased cars for the two executive officers." (Craig Blais Aff. at 2). Defendant provides no explicit argument as to why the statement should be struck. If offered for its truth, this statement would clearly be hearsay. However, the truth of the matter asserted—that WBDC provided leased cars—is not disputed by the parties. It is more likely, therefore, that the statement is being offered to show Willoughby's knowledge of WBDC's executive automobile policy. If the statement is not offered for its truth, it is not hearsay, and will not be struck.

## 2. <u>Statements Allegedly Unsupported by the Record</u>

Defendant next contends that statements in Craig's affidavit about the contents of WBDC telephone records are inadmissible because they are unsupported by the record. Plaintiff concedes that Craig's original affidavit was not accompanied by the necessary supporting documents, but maintains that she has corrected the issue by submitting those documents along with an additional supporting affidavit. (*See* Stewart Aff.).

Fed. R. Civ P. 56(e) permits a court to give parties "an opportunity to properly support or address" a fact that was not properly supported in the first instance. Here, plaintiff has cured the defect in Craig's initial affidavit by submitting an additional affidavit authenticating the telephone

---

[8] Because the statements are admissible for their truth, the Court need not address plaintiff's remaining theories of admissibility. However, the Court notes that Willoughby's statements would probably also be admissible for their legal effect under a theory of apparent authority. *See Shumway v. Home Fire & Marine Ins. Co.*, 301 Mass. 391 (1938) (insurer can be held liable for agent acting within its apparent authority); *see also Allmerica Fin. Corp. v. Certain Underwriters at Lloyd's*, 449 Mass. 621, 639 (2007) (citing *Shumway* for this proposition).

records in question, along with a copy of those records.  Under the circumstances, the objected-to statements will not be struck.

### 3.    Statements Allegedly Contradicted by Prior Testimony

Defendant next contends that the following statement in Craig's affidavit should be struck because it is contradicted by prior testimony:

> Don Willoughby stated that the Hartford policies were a benefit or bonus to me as Executive Vice President because the Hartford policies would protect me personally, my home and my assets.

(Craig Blais Aff. at 2).  In support, defendant points to the following responses in Craig's deposition:

> Q:    At any point in time before January 2006, did Mr. Willoughby ever describe to you the purpose of non-owned automobile liability insurance coverage?
>
> A:    No.
>
> Q:    Was there ever a time when you participated in any discussion with any person other than your wife or your lawyer about whether or not the insurance coverage that WBDC was purchasing for its business would also cover you as an individual in your personal affairs?
>
> A:    There was some discussion in the meeting about purchasing, WBDC purchasing an overall umbrella policy to cover gaps in the insurance that may exist.

(Pl. Facts Ex. 1 at 34-35).[9]  Defendant states that these responses are "ignorant at best, and elusive at worst, in terms of describing the nature of the insurance coverages purchased by WBDC."  (Def. 2d Mot. Strike at 9).

"When an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory."

---

[9] Defendant cites other responses in Craig's deposition, but none of these relate as clearly as the quoted responses to the objected-to statement.

*Colantuoni v. Alfred Calcagni & Sons, Inc.*, 44 F.3d 1, 4-5 (1st Cir. 1994). Neither of Craig's deposition responses, however, are clearly contradicted by his affidavit statement. The first deposition response goes to the purpose of the insurance, and Craig's affidavit statement—which might go to the effect of the insurance as easily as its purpose—is not clearly contradictory. The second deposition response actually implies that some discussion *did* occur about the effect of the polices on Craig's personal affairs, and it is unclear in any case. As a result, the affidavit statement will not be struck.[10]

### 4. Allegedly Irrelevant Statements

Finally, defendant moves to strike two statements in Craig's affidavit for lack of relevance. Only relevant evidence is admissible. Fed. R. Evid. 402. "Relevant evidence" is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401.

The first objectionable statement is as follows:

I relied on Don Willoughby's representations and I expected that the policies that WBDC purchased from [T]he Hartford would provide me with coverage for any auto accident.

(Craig Blais Aff. at 2). Defendant contends that Craig's subjective expectations are irrelevant to this action. Plaintiff contends that the statement is relevant under Massachusetts law because it goes to the objectively reasonable expectations of the policyholder, WBDC.

Under Massachusetts law, the court may examine the reasonable expectations of the policyholder if necessary to clear up ambiguity. "If in doubt [as to a contract's meaning], we

---

[10] Defendant also contends that Craig's statements are contradicted by the testimony of Joyce Stewart. This contention, if true, goes to credibility and is not a grounds for striking the testimony.

consider what an objectively reasonable insured, reading the relevant policy language, would expect to be covered." *Boston Gas Co. 1 v. Century Indem. Co.*, 454 Mass. 337, 356 (2009) (quoting *A.W. Chesterton Co. v. Mass. Insurers Insolvency Fund*, 445 Mass. 502, 518 (2005)). Even without considering whether Craig's expectations can be said to reflect WBDC's expectations, however, his subjective view is irrelevant under the stated rule.[11] The analysis outlined by the Massachusetts courts takes the viewpoint of an average, reasonable person. *See A.W. Chesterton Co.*, 445 Mass. at 520. This analysis, by definition, ignores whatever expectations the parties to the contract claim they possessed. Accordingly, this statement is not relevant and will be struck.

Defendant next objects to the following statement:

[O]n the morning of the automobile accident (January 9, 2006), I used my WBDC cell phone at approximately 8:00 am to call in for WBDC business messages.

(Craig Blais Aff. at 3). Defendant contends that coverage turns on whether the rental car was used for business purposes, and the fact of a same-day business call is irrelevant to that determination. Plaintiff responds that the call is relevant to the question of whether Craig was engaged in "business or personal affairs" while driving his car.

As discussed below, the phrase "business or personal affairs" is ambiguous. Whether the

___

[11] Citing non-binding authority, plaintiff contends that the Court should also consider Craig's expectations as a beneficiary of the policy. *See Markline Co. v. Travelers Ins. Co.*, 384 Mass. 139, 146 (1981) (Liacos, J., dissenting) (describing doctrine as applying to applicants and intended beneficiaries); ROBERT E. KEETON, INSURANCE LAW RIGHTS AT VARIANCE WITH POLICY PROVISIONS, 83 Harv. L. Rev. 961 (1970) (same). As stated and applied in Massachusetts, however, the doctrine of reasonable expectations considers only the expectations of policyholders. *See, e.g., Boston Gas Co.*, 454 Mass. at 356; *A.W. Chesterton Co.*, 445 Mass. at 518*; 116 Commonwealth Condominium Trust v. Aetna Cas. & Sur. Co.*, 433 Mass. 373, 377 (2001); *Bond Bros., Inc. v. Robinson*, 393 Mass. 546, 551-552 (1984); *Home Indem. Ins. Co. v. Merchants Distribs., Inc.*, 396 Mass. 103, 107 (1985); *Hazen Paper Co. v. United States Fid. & Guar. Co.*, 407 Mass. 689, 700 (1990); *Trustees of Tufts Univ. v. Commercial Union Ins. Co.*, 415 Mass. 844, 849 (1993); *Commerce Ins. Co. v. Koch*, 25 Mass. App. Ct. 383, 388 (1988). Moreover, even if plaintiff's formulation of the doctrine were the law in Massachusetts, Craig's subjective expectations would remain irrelevant for reasons stated below.

phone call is relevant depends on the definition of business or personal affairs, and that definition requires examination of disputed extrinsic evidence. Because the Court cannot interpret "business or personal affairs" at this stage in the proceedings, the cell phone call is not clearly irrelevant and will not be struck.

### 5. Conclusion

Accordingly, defendant's motion to strike portions of Craig's affidavit will be denied as to the alleged hearsay statements; the statements allegedly unsupported by the record; the statements allegedly contradicted by prior testimony; and the statement about the cell phone call on the day of the accident; and will be granted as to the description of Craig's subjective expectations.

### B. Defendant's Motion for Summary Judgment

Defendant next moves for summary judgment. For reasons stated below, summary judgment will be granted as to the chapter 93A claim and denied as to plaintiff's request for declaratory relief.

Before proceeding to the analysis of the issues, the Court first addresses the choice-of-law issue and briefly outlines general contract principles.

### 1. Choice of Law

The interpretation of contacts is a question of state law. *See Klaxon Co. v. Stentor Mfg. Co.*, 313 U.S. 487, 496 (1941); *Ruggerio Ambulance Serv. v. National Grange Ins. Co.*, 430 Mass. 794, 797 (2000). Where federal jurisdiction is based on diversity of citizenship, as it is here, the Court must apply the conflict of laws rules of Massachusetts to determine which state law governs the contract. *See Klaxon*, 313 U.S. at 496. Where the parties have not elected to employ the law of a particular jurisdiction, contract rights in Massachusetts are determined using

a "functional approach" that "is explicitly guided by the Restatement (Second) of Conflict of Laws." *Levin v. Dalva Bros.*, 459 F.3d 68, 74 (1st Cir. 2006); *see Bushkin Associates, Inc. v. Raytheon Co.*, 393 Mass. 622, 631 (1985) ("[We] seek instead a functional choice-of-law approach that responds to the interests of the parties, the States involved, and the interstate system as a whole"); *Clarendon Nat'l Ins. Co. v. Arbella Mut. Ins. Co.*, 60 Mass. App. Ct. 492 (2004) (applying this approach to insurance contract).

The relevant section of the restatement is § 193, which provides that the rights created by a contract for casualty insurance "are determined by the local law of the state which the parties understood was to the be the principal location of the insured risk during the term of the policy." RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 193; *Clarendon Nat'l Ins.*, 60 Mass. App. Ct. at 496.[12] The parties here understood the risk for both the general liability and hired/non-owned automobile coverage to be principally located in Massachusetts. Discussions about the policy took place in Massachusetts and concerned a Massachusetts company with little or no significant business contacts outside the state. Thus, the Court will apply the Massachusetts law of contracts.

### 2.    General Contract Principles

In Massachusetts, "[t]he interpretation of a contract presents a question of law for the court, except to the extent disputed facts bear upon such interpretation." *USM Corp. v. Arthur D. Little Sys.*, 28 Mass. App. Ct. 108, 116 (1989); *see Robert Industries, Inc. v. Spence*, 362

---

[12] Section 193 also allows for courts to choose another state where "with respect to the particular issue, some other state has a more significant relationship" under general choice of law principles, including the protection of justified expectations and the certainty, predictability, and uniformity of the result. RESTATEMENT (SECOND) OF CONFLICT OF LAWS §§ 6, 193. This is not the case here.

16

Mass. 751, 755 (1973). The general law of contracts applies. *Boston Gas Co.*, 454 Mass. at 355.

In addition, "[w]hen the relevant facts upon which coverage of a claim is premised are not in dispute, the application of the insurance policy to those facts is [] a question of law that can be resolved on summary judgment." *Amtrol, Inc. v. Tudor Ins. Co.*, 2002 WL 31194863, at *4 (D. Mass. 2002 Sep. 10, 2002); *see Liberty Mut. Ins. Co. v. Metro. Life Ins. Co.*, 260 F.3d 54, 61 (1st Cir. 2001) (interpretation of insurance polices where relevant facts are not in dispute is a question of law). "The object of the court is to construe the contract as a whole, in a reasonable and practical way, consistent with its language, background, and purpose." *USM Corp.*, 28 Mass. App. Ct. at 116.

If an insurance contract is unambiguous, "we must construe the words of the policy in their usual and ordinary sense." *Boston Gas Co.*, 454 Mass. at 355. Consistent with this, "[e]very word in an insurance contract must be presumed to have been employed with a purpose and must be given meaning and effect whenever practicable." *Id.* (internal quotations omitted). Furthermore, "[extrinsic] evidence may not be admitted to contradict the clear terms of an agreement, or to create ambiguity where none otherwise exists." *ITT Corp. v. LTX Corp.*, 926 F.2d 1258, 1261 (1st Cir. 1991) (citing *Governor Apartments, Inc. v. Carney*, 342 Mass. 351, 354 (1961)); *see SMS Fin. V, LLC v. Conti*, 68 Mass. App. Ct. 738, 750 (2007).

If the insurance contract is ambiguous, the Court's analysis shifts in three important ways. First, the Court may consider extrinsic, factual evidence "bearing upon the background and purpose of the parties, as well as their understanding of the meaning of particular language used in the contract." *USM Corp.*, 28 Mass. App. Ct. at 116; *see Affiliated FM Ins. Co. v. Constitution Reinsurance Corp.*, 416 Mass. 839, 842 (1994); *Keating v. Stadium Management Corp.*, 24

Mass. App. Ct. 246, 249 (1987).[13]  Second, any doubts about a term's meaning must be resolved

in favor of the insured.  *Boston Gas Co.*, 454 Mass. at 356; *County of Barnstable v. Am. Fin.

Corp.*, 51 Mass. App. Ct. 213, 215 (2001); *see August A. Busch & Co. v. Liberty Mut. Ins. Co.*,

339 Mass. 239, 243, 158 N.E.2d 351 (1959).[14]  Finally, where a term is ambiguous, its

interpretation becomes a question of fact.  *Compagnie de Reassurance D'ile de France v. New*

*England Reinsurance Corp.*, 57 F.3d 56, 75 (1st Cir. 1995) (citing *Commercial Union Ins. Co. v.*

*Boston Edison Co.*, 412 Mass. 545, 557 (1992)).

"[A]mbiguity exists in an insurance contract when the language contained therein is

susceptible of more than one meaning."  *Lumbermens Mut. Casualty Co. v. Offices Unlimited*,

419 Mass. 462, 466 (1995).  Ambiguity is determined in the context of the policy as a whole.

Words that are not ambiguous by themselves "may become ambiguous when read in the context

of an insurance policy," and words that appear ambiguous may become clear.  *Id.* at 467.

"[D]ifficulty in comprehension does not equate with ambiguity," nor does ambiguity exist simply

because the parties propound different interpretations.  *Mass. Prop. Ins. Underwriting Ass'n v.*

*Wynn*, 60 Mass. App. Ct. 824, 827 (2004); *see Lumbermens*, 419 Mass. at 466 (controversy does

not create ambiguity); *Markline Co. v. Travelers Ins. Co.*, 384 Mass. 139, 140 (1981)

(complexity does not create ambiguity).

---

[13] If the insurance contract is ambiguous on its face, extrinsic evidence may be considered for the purpose of contradicting or changing the terms of the contract to accord with the intent of the parties.  *Affiliated FM*, 416 Mass. at 842; *Robert Industries*, 362 Mass. at 754-55; *Keating*, 24 Mass. App. Ct. at 249.  If the contract is clear on its face but ambiguous when applied to the subject matter, "all the circumstances of the parties leading to its execution may be shown for the purpose of elucidating, but not of contradicting or changing its terms."  *Affiliated FM*, 416 Mass. at 842; *Keating*, 24 Mass. App. Ct. at 249.

[14] Where the policy is not ambiguous on its face, the interpretation should favor neither party.  *Markline Co. v. Travelers Ins. Co.*, 384 Mass. 139, 140 (1981); *Barnstable*, 51 Mass. App. Ct. at 215.

Even where extrinsic evidence has been admitted, the focus remains on the parties'

probable intent, informed by "justice and common sense." *Affiliated FM*, 416 Mass. at 846.

"[T]he words themselves remain the most important evidence of intention." *Id.* at 845-46. "If in

doubt, we consider what an objectively reasonable insured, reading the relevant policy language,

would expect to be covered." *Boston Gas*, 454 Mass. at 357; *A.W. Chesterton Co.*, 445 Mass. at

518.

### 3.    The Request for Declaratory Relief

Defendant first moves for summary judgment as to plaintiff's request for declaratory relief.

It contends that the unambiguous meaning of both the general liability policy and the umbrella

policy excludes liability for the Florida car accident. It asserts that the parties intended the

hired/non-owned endorsement to cover use of vehicles for WBDC business purposes only, and

that an accident involving a rental car driven by an employee while on vacation is clearly outside

the scope of that coverage. Plaintiff responds that the policy is ambiguous both on its face and as

applied to the subject matter at issue in this case. Plaintiff contends that because the policy is

ambiguous, and because the relevant extrinsic evidence involves disputed issues of material fact,

summary judgment is inappropriate at this stage.

Although this case presents a myriad of interpretive issues, plaintiff may defeat summary

judgment by showing the existence of any ambiguity that could reasonably lead a jury to find

coverage. As set forth below, plaintiff has demonstrated at least one plausible theory on which a

jury could find coverage in this case. Accordingly, summary judgment is not appropriate.

To qualify for coverage under the hired/non-owned automobile endorsement, an accident

must satisfy two requirements: first, it must involve a "non-owned auto" within the meaning of

Section A of the endorsement; and second, it must have been operated by an "insured" within the meaning of Section B. The Court considers each requirement in turn.

### a.     Whether the Rental Car was a "Non-Owned Auto"

For coverage to exist, the rental car operated by Craig at the time of the accident must qualify as a "non-owned auto" under Section A of the hired/non-owned endorsement. That section provides as follows:

A "non-owned auto" is an "auto" you do not own including but not limited to:

1.     An "auto" that you lease, hire, rent or borrow;
2.     A customer's "auto" that is in your care, custody, or control for service; and
3.     An "employee's" "auto" while used in your business or personal affairs.

. . . This includes "autos" owned by your "employees" or partners or members of their households but only while used in your business or personal affairs.

(Def Facts Ex. A).[15] There are at least two ambiguities in this section as applied to the facts of this case.

The first ambiguity centers on the phrase "including but not limited to." It is undisputed that the rental vehicle does not fall into any of the categories of "auto" explicitly enumerated in Section A. Plaintiff contends that the critical language of Section A is the opening phrase, "A non-owned auto is an auto you do not own." According to plaintiff, this language creates a very broad definition, and the phrase "including but not limited to" means that the subsequent categories are exemplary only and non-limiting. Defendant contends that plaintiff's theory is not a reasonable interpretation, because it would "capture any auto not owned by WBDC [and] extend

_____

[15] "You" and "your" refer to WBDC and its subsidiary, WBDC, LLC. The unmodified general liability policy also defines executives, shareholders, and employees as "insureds" in limited circumstances not relevant here.

coverage to every vehicle on the road." (Def. Summ. J. at 15). At a minimum, defendant contends, the categories should act to restrict "non-owned auto" to a class of autos that have some relationship to the employer. Under this theory, a car rented by a corporate officer's spouse for personal purposes while on vacation would not qualify.

It is true that the phrase "a non-owned auto is an auto you do not own" is extremely expansive, and on its face covers all non-owned vehicles anywhere in the world. It is also true that the phrase "including but not limited to" renders the listed categories illustrative but not exhaustive. *See Meadwestvaco Corp. v Worcester New Bond LLC*, 2009 WL 971273, at *9 (Mass. Super. Ct. Jan. 6, 2009) ("including but not limited to . . . clearly signal[s] that other items might be included as well"). It would be irrational to conclude that the definition of "non-owned auto" was intended to cover every vehicle, everywhere. But it would contradict the express terms of the policy to hold that it covered only the specific types of vehicles given as examples.

The problem, then, is that the boundary between covered vehicles and non-covered vehicles must lie somewhere between the narrowest possible interpretation (the enumerated categories of vehicles, which are examples only) and the broadest possible interpretation (every vehicle on the road). There is nothing in the language of the policy that describes where that boundary lies; instead, the Court must look beyond the contract, to the purpose of the policy and the parties' understandings, to ascertain what automobiles the policy was meant to cover. In other words, the terms of the contract are ambiguous, and the Court cannot determine that coverage of the rental vehicle is excluded as a matter of law.

The second ambiguity in the policy centers on the phrase "your business or personal affairs" (which is used twice). On the one hand, the word "your" might modify both "business"

and "personal affairs," so that it would effectively read, "your business and your personal affairs." But this interpretation does not seem sensible, because a corporation cannot have "personal affairs."[16] On the other hand, the word "your" might modify only "business," so that it would effectively read, "your business and [his or her] personal affairs." But this interpretation is problematic, too, as it would result in very broad coverage (every employee's vehicle would be covered) and a somewhat awkward phrasing ("employee's auto while used in . . . personal affairs").

Citing cases in other jurisdictions, defendant asks the Court to determine that this phrase is unambiguous and restricted to use of an auto for a corporation's "personal affairs," which clearly excludes an officer's use of a rental car while on vacation. *See Pham v. Hartford Fire Ins. Co.*, 419 F.3d 286, 290 (4th Cir. 2005) (employee returning home from bar not engaged in "personal affairs" of corporation); *Alaska Nat'l Ins. Co. v. Bryan*, 125 Wash. App. 24, 31-32 (2004) (phrase is broader than "course and scope of employment" but cannot reasonably encompass an employee's night out drinking); *Wolfensberger v. Eastwood*, 382 Ill. App. 3d 924, 928 (2008) (interpreting phrase to cover "employees while acting in the scope of their employment"). In rebuttal, plaintiff points to cases construing the same or similar language as ambiguous. *See Vandevander v. State Auto Ins. Co.*, 2004 WL 1368313, at *1 (Ohio Ct. App. June 18, 2004) (the phrase "your personal affairs" when referring to a corporation is ambiguous); *Donegal Mut. Ins. Co. v. Acton Bus. Ctr., Inc.*, 1999 WL 1568618, at *7 (Del. Super. Ct. Oct. 21, 1999) ("[A]

---

[16] *See FCC v. AT&T, Inc.*, 131 S. Ct. 1177, 1183 (2011) (noting, albeit in another context, that corporations cannot have personal affairs; "[w]hen it comes to the word 'personal,' there is little support for the notion that it denotes corporations, even in the legal context.").

corporation clearly does not have 'personal affairs'; hence this language is ambiguous."); *Lincoln Gen. Ins. Co. v. Gateway Sec. Servs.*, 2007 WL 3203020, at *16 (E.D. Cal. Oct. 29, 2007) ("The concept of 'personal affairs' of an entity is anomalous because an entity . . . does not engage in 'personal activities.' This creates ambiguity.").

Despite the existence of some case law in support of defendant's request, construing "personal affairs" to mean the "personal affairs" of WBDC—when a corporation can have no personal affairs—strikes the Court as equivalent to reading the language out of the contract altogether. This construction should be avoided if at all possible. "Every word in an insurance contract must be presumed to have been employed with a purpose and must be given meaning and effect wherever practicable." *Boston Gas Co.*, 454 Mass. at 355 (internal quotations omitted). As a consequence, the Court concludes that it is necessary to resort to extrinsic evidence to determine what the parties intended "personal affairs" to mean, a process that necessarily turns on disputed questions of fact.

In short, "non-owned" auto is an ambiguous term that can only be interpreted by resort to extrinsic evidence. Some of that evidence is undisputed; for example, it is undisputed that WBDC provided personal-use automobiles to its two executives, including Craig, and that it paid for a primary insurance policy on Craig's vehicle. But disputes of material fact remain—for example, as to whether certain representations were made by the agent at the time the policy was issued. The question of whether the rental vehicle is included in the definition of "non-owned auto" therefore cannot be resolved on summary judgment.[17]

---

[17] This ruling is also consistent with the principle that ambiguous terms in an insurance contract should be construed against the insurer.

**b.     Whether Craig Blais Was an "Insured"**

The Court next considers whether Craig was an "Insured" under the endorsement while driving the Florida rental car.  Section B of the hired/non-owned endorsement defines "insured" as follows:

The following are "insureds":

    a.  You.

    b.  Your "employee" while using with your permission:

        (1)     An "auto" you hire or borrow; or
        (2)     An "auto" you don't own, hire or borrow in your business or personal affairs; or
        (3)     An "auto" hired or rented by your "employee" on your behalf and at your direction.

    c.  Anyone else while using with your permission a "non-owned auto" except:

        (1)     The owner or anyone else from whom you hire or borrow a "non-owned auto".
        (2)     Someone using a "non-owned auto" while he or she is working in a business of selling, servicing, repairing, parking or storing "autos" unless that business is yours.
        (3)     Anyone other than your "employees", partners, a lessee or borrower or any of their "employees", while moving property to or from a "non-owned auto".
        (4)     A partner of yours for a "non-owned auto" owned by him or her or a member of his or her household.

(Def. Facts Ex. A).  The parties dispute whether Craig is properly classified under Section B(b) or B(c) of the endorsement.  Plaintiff contends that Craig falls within the ambit of Section B(c) because he is an executive officer and not an "employee."  Defendant responds that, even if Craig is an executive officer within the meaning of the general liability policy, he would still be treated as an "employee" under Section B(b) of the endorsement because there is no specific reference to

"executive officers" in Section B(c).

The words of an insurance contract are construed in light of the entire contract. *See Lumbermens*, 419 Mass. at 467-68. When interpreted in the context of the general liability policy that it modifies, the language of the endorsement clearly supports plaintiff's position. The "definitions" section for the general liability policy defines "executive officer" and "employee" separately. (Def. Facts Ex. B at 67). "Executive officers" and "employees" are also treated differently for purposes of non-automobile liability. (*See id.* Ex. B at 59-60). Although the endorsement does not explicitly mention "executive officers," it distinguishes between "employees" and "everyone else" in defining the classes of "insureds." Absent evidence that "anyone else" excludes executive officers, the interpretation that is most consistent with the overall insurance policy is one where "executive officers" remains distinct from "employees" and falls within the "anyone else" category. The Court therefore finds that Craig falls within Section B(c) of the endorsement.

Section B(c) requires the permission of WBDC for coverage to apply to Craig's operation of the Florida rental caR. Plaintiff contends that Craig has implied permission from WBDC to drive a rental car while on vacation because WBDC had a longstanding practice of furnishing him with an automobile for his personal use as part of his compensation package. Defendant contends that "the only reasonable construction of the term 'permission' is that authority must come from [WBDC] and it must relate to the specific use of the vehicle." (Def. Resp. to Pl. Suppl. Mem. at 12).

In the absence of explicit language to the contrary, permission may be express or implied. COUCH ON INSURANCE 3D § 112:20; *see Hingham Mut. Fire Ins. Co. v. Niagara Fire Ins. Co.*, 46

Mass. App. Ct. 500 (where policy required only "permission," permission could be express or implied).  As there is no evidence of express permission here, the issue before the Court turns on whether Craig had implied permission to use the Florida rental car.

The parties do not cite—and the Court has been unable to locate—any Massachusetts cases that squarely address the question at issue in this case.  Nevertheless, the existing cases suggest that Massachusetts takes a broad view of implied consent.  In *Niagara Fire Ins. Co.*, the Appeals Court addressed "whether a perceived emergency by an unlicensed minor, who had ingested a narcotic, which results in her suddenly grabbing the steering wheel [and] causing an accident is sufficient to give rise to implied consent."  46 Mass. App. Ct. at 502.  The court held that it was.  Although the policy required consent as an antecedent to liability, the court stated that the passenger's belief, if it had been correct, "would give rise to an emergency situation from which one could infer that the driver would have conferred consent upon her."  *Id.* at 503.

In *Owens v. Dinkins*, the Supreme Judicial Court found implied consent to use an automobile where permission had been granted only once before.  345 Mass. 106, 108-09 (1962).[18]  Plaintiff presented testimony that the individual using the car had driven the car with express consent once, that he was a regular visitor to the car owner's home and was considered "part of the family," and that he had never been expressly forbidden from taking it.  *Id.*  The Court found that "this testimony, if accepted, . . . gave a basis for the finding of implied consent, that is, of acquiescence in [the borrower's] use of the car without the express consent of [the owner] in

---

[18] This case, along with a significant part of the relevant case law in Massachusetts, addresses permission to use an automobile in the context of a statute not at issue here.  *See O'Roak v. Lloyd's Cas. Co.*, 285 Mass. 532, 536-37 (1934) (defining "permission" in terms of statutory language).  Although not controlling, these cases are nevertheless helpful.

the particular instance." *Id.*; *cf. White v. Standard Accident Ins. Co.*, 302 Mass. 474, 475-76 (1939) (no implied consent where permission to use the vehicle was expressly denied).

Taken together, these cases suggest that implied consent may exist with very little in the way of authorization from the insured to the driver of the vehicle. The Massachusetts courts have inferred "emergency" consent where there was no evidence of authorization on the record, *Niagara Ins. Co.*, 46 Mass. App. Ct. at 502, and they have inferred consent where permission had been given only once before and only for a specific previous use, *Owens*, 345 Mass. at 108-09.

This also appears to be consistent with the general common law of permission. "In the absence of a policy provision requiring a specific indication of permission, the named insured may generally signify 'permission' in any way." COUCH ON INSURANCE 3D § 112:37 (collecting cases). "Implied permission may arise as a product of the present or past conduct of the insured . . . . [and] is usually shown by such usage and practice of the parties over a sufficient period of time prior to the day on which the insured car was being used . . . as would indicate to a reasonable mind that the permittee had the right to assume permission under the particular circumstances. . . . The classic example of past practice supporting a claim of implied permission is the lack of objection to past use by the permittee, signifying acquiescence or consent of the insured." *Id.* § 112:39.

In light of the case law, it does not appear that a finding that Craig had implied permission to operate to rental car is necessarily precluded as a matter of law.[19] First, it is undisputed that

---

[19] Contrary to defendant's contention, the law in Massachusetts and elsewhere does not clearly require a separate authorization for each specific use. *See, e.g.*, *Owens*, 345 Mass. at 108-09. The language of the policy also does not explicitly require that such permission relate to WBDC's "business or personal affairs." Section B(c) makes no reference to that term, and Section A, discussed above, includes but is not limited to the one example that employs that language.

WBDC leased and provided a vehicle to Craig for personal, non-business use. Second, it is undisputed that the Encompass automobile insurance policy that WBDC provided to Craig covered personal, non-business uses, including the Florida accident. Third, WBDC does not appear to have objected to the Craig's claim under the general liability policy for the Florida accident. Finally, Craig and WBDC's Rule 30(b)(6) witness testified that Willoughby told them the hired/non-owned endorsement would act like an umbrella policy for their officers' personal insurance policies. This evidence, if believed, could lead a reasonable jury to conclude that the parties intended the policy to act as a "back-up" for WBDC's two executives in both their business-related and personal activities, including the driving of rental vehicles while on vacation. Accordingly, whether Craig had permission from WBDC to use the Florida rental vehicle cannot be resolved on summary judgment.

### c. Coverage under the Umbrella Policy

The parties next dispute whether the umbrella policy provides additional back-up coverage for Craig's accident. For reasons given below, the Court finds that coverage under the umbrella policy is contingent on coverage under the general liability policy.

Plaintiff's first theory appears to be that the umbrella policy provides back-up coverage for the personal liability insurance issued to Craig by Encompass. Defendant contends that the umbrella policy does not provide excess coverage to the Encompass insurance policy because the Encompass policy is not explicitly listed in the attached schedule of underlying policies. Plaintiff appears to contend that WBDC meant to include the Encompass policy in the schedule of underlying policies, but that defendant negligently failed to list it. (Pl. Facts Ex. E).

Plaintiff's theory cannot survive summary judgment. The umbrella policy specifically and

unambiguously excludes "liability arising out of the . . . use . . . of any 'auto'" except for policies listed in the "Schedule of Underlying Insurance Policies." (Def. Facts Ex. B. at 169). The schedule of underlying insurance policies clearly does not list the Encompass policy. (*Id.* Ex. B at 158). Plaintiff appears to contend that another, unrelated form requested information concerning personal automobile insurance but was left blank by defendant or its agent, and that defendant therefore negligently failed to incorporate the information. (*See* Pl. Opp'n to Def. Facts. ¶ 35). However, the presence or absence of information on an unrelated form is irrelevant. WBDC presumably had an opportunity to review the umbrella policy and schedule of underlying policies before agreeing to it. That policy clearly provided that "[b]y accepting this policy, you agree . . . [that] the statements in the Extension Schedule of Underlying Insurance Policies are accurate and complete." (*See* Def. Facts Ex. B at 155). Had WBDC wanted to ensure coverage for the Encompass policy, it would have requested that the policy be added to the schedule of underlying policies. It did not. Therefore, the umbrella policy excludes coverage for automobile liability claims arising under the Encompass automobile insurance.

Plaintiff's second theory appears to be that the umbrella policy provides coverage as a back-up to the general liability policy. Unlike the Encompass insurance, the general liability policy is listed on the schedule of underlying policies. (Def. Facts Ex. B at 158). The parties also appear to agree that coverage under the umbrella policy follows form to coverage under the general liability policy. (*See* Def. Summ. J. at 17). Coverage under the umbrella policy therefore remains contingent on coverage under the general liability policy, which turns on disputed questions of fact. Accordingly, whether Craig's accident is covered by the umbrella policy cannot be resolved on summary judgment.

###    d.    Conclusion

In conclusion, the request for declaratory relief as to both the general liability policy and the umbrella policy cannot be determined without considering disputed factual evidence. Accordingly, summary judgment will be denied.[20]

###    3.    The Chapter 93A Claim

Defendant next moves for summary judgment on plaintiff's claim that defendant engaged in unfair claims settlement practices within the meaning of Mass. Gen. Laws. chs. 93A and 176D. Defendant contends that the record is devoid of any evidence of bad faith in its handling of plaintiff's insurance claim, and that mere denial of coverage is not sufficient to sustain a cause of action under Mass. Gen. Laws ch. 93A. In response, plaintiff contends that defendant was aware that its policy was ambiguous as written and used that ambiguity to deny coverage. Plaintiff further contends that defendant failed to conduct a reasonable investigation into its claim of coverage.

Mass. Gen. Laws ch. 176D prohibits certain unfair acts by insurers related to the investigation, settlement, and payment of claims. Although chapter 176D does not create a private right of action, claims under chapter 93A may be based on conduct that also violates chapter 176D. *See, e.g.*, *Continental Ins. Co. v. Bahnan*, 216 F.3d 150, 157 (1st Cir. 2000) ("[C]onduct that abridges [ch. 176D] may or may not abridge [ch. 93A]."); *Brazas Sporting Arms, Inc. v. American Empire Surplus*, 220 F.3d 1, 9 (1st Cir. 2000); *Kiewit Const. Co. v. Westchester Fire Ins. Co.*, 878 F. Supp. 298, 302 (D. Mass. 1995); *M. DeMatteo Constr. Co. v.*

---

[20] In doing so, however, the Court underscores that the policy must still be construed "in a reasonable and practical way, consistent with its language, background, and purpose," *USM Corp.*, 28 Mass. App. Ct. at 116, as well as "justice and common sense." *Affiliated FM*, 416 Mass. at 846. The policy cannot reasonably be construed to cover "any use by any vehicle of any employee."

*Century Indem. Co.*, 182 F. Supp. 2d 146, 162 (D. Mass. 2001).[21]

Various acts or practices of insurers, such as the failure of an insurer to settle a claim promptly when liability under a contract has become "reasonably clear," can constitute unfair acts or practices under chapter 93A. *See, e.g.*, *Federal Ins. Co. v. HPSC, Inc.*, 480 F.3d 26, 34-35 (1st Cir. 2007) (citing Mass. Gen. Laws ch. 176D, § 3(9)(f)). However, an insurer is not in violation of chapter 93A if it denies coverage, in good faith, on a "reasonable or plausible" interpretation of a contract. *See, e.g.*, *HPSC*, 480 F.3d at 36 ("A plausible, reasoned legal position that may ultimately turn out to be mistaken . . . is outside the scope of the punitive aspects of the combined application of c. 93A and c. 176D."); *Peterborough Oil Co., Inc. v. Great American Ins. Co.*, 397 F. Supp. 2d 230, 244-45 (D. Mass. 2005). But an absence of good faith "[can] support[] [an] unfair settlement practice determination, even in the face of a plausible coverage position." *HPSC*, 480 F.3d at 36.

Defendant's decision to deny coverage appears to have been reasonable. As discussed, and at a minimum, Section A is ambiguous in at least two ways. Defendant's stated reasons for denial were plausible in light of that ambiguity. (*See* Def. Facts Ex. J). There is also no basis in the record for believing that its decision was made in bad faith. Under the circumstances, defendant's denial of coverage—even if incorrect—cannot form the basis for a chapter 93A violation.

The fact that some courts have ruled the other way on similar issues, even if defendant knew of those decisions, is of no moment. The law does not require defendant to understand or

---

[21] Chapter 176D is enforceable only by the state commissioner of insurance. *See, e.g.*, *Metropolitan Prop. and Cas. Ins. Co. v. Boston Reg. Physical Therapy, Inc.*, 538 F. Supp. 2d 338, 343 (D. Mass. 2008) (quoting *Thorpe v. Mut. of Omaha Ins. Co.*, 984 F.2d 541, 544 n.1 (1st Cir. 1993)).

to act on non-binding caselaw, particularly where there is law to the opposite effect.

Plaintiff's claim that defendant's investigation was improper is also without merit. The evidence instead indicates that defendant conducted a prompt and reasonably thorough claims investigation. Defendant's claims handler, Patty Gooch, contacted and interviewed WBDC four days after receiving notification of the claims. In that interview, she spoke with the president of the named insured and made reasonable inquiries into the facts surrounding the accident.[22] The claim was reviewed and discussed by three employees, one of them an attorney admitted to practice in Massachusetts. The denial of claim letter clearly describes the basis for denial. Upon receipt of plaintiff's chapter 93A demand letter, the case was again reviewed and denied by additional employees of defendant, as well as outside counsel.

Given these facts, defendant's actions did not violate chapter 93A. "If an insurance company has a reasonable and good faith belief that it is not obliged to make a payment to a claimant who is asserting a violation of [chapters 93A and 176D], asserts the point, and offers to take active steps to resolve the dispute, the company's action, even if ultimately held to be based on a misinterpretation of the law, would not be an unfair settlement practice." *Premier Ins. Co. v. Furtado*, 428 Mass. 507, 510 (1998).

Accordingly, summary judgment will be granted as to these claims.

### C.    Motion to Strike Plaintiff's Supplemental Interrogatories and for Sanctions

Defendant's motion to strike plaintiff's supplemental interrogatories and for sanctions concerns evidence that goes exclusively to plaintiff's chapter 93A claim. Because the Court

---

[22] She also recorded in her notes that WBDC told her not to contact Craig because he was still dealing with the consequences of Samantha's injury. (Def. Facts. Ex. O).

dismisses that claim, defendant's motion will be denied as moot.

### D. Plaintiff's Motion for Attorney's Fees

Plaintiff moves for attorney's fees related to her efforts to require defendant to produce a corporate witness as required by Fed. R. Civ. P. 30(b)(6). On April 30, 2010, plaintiff filed a motion pursuant to Fed. R. Civ. P. 37(d) seeking sanctions for defendant's failure to provide such a witness. In an order dated July 27, 2010, this Court agreed that defendant had violated Fed. R. Civ. P. 30(b)(6) and awarded reasonable attorney's fees and costs related to the filing of plaintiff's 37(d) motion.

Plaintiff's counsel has submitted an affidavit indicating that it spent a total of 10.3 hours working on this aspect of the case, for a total amount of $3,672.00. Accordingly, the Court will grant plaintiff's motion and order defendant to pay these costs.

## IV. Conclusion

For the foregoing reasons, defendant's motion for summary judgment is GRANTED in part and DENIED in part. Defendant's motion to strike plaintiff's supplemental interrogatories is DENIED as moot, and defendant's motion to strike portions of Craig's affidavit is GRANTED in part and DENIED in part. Plaintiff's motion for attorney's fees is GRANTED.

**So ordered.**

　　　　　　　　　　　　　　　　　  /s/ F. Dennis Saylor
　　　　　　　　　　　　　　　　　F. Dennis Saylor IV
　　　　　　　　　　　　　　　　　United States District Judge

Dated: March 30, 2011